**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TRENTON DUANE DAWKINS,**

    **Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

Civil Action 2:20-cv-5000
Chief Judge Algenon M. Marbley
Magistrate Judge Chelsey M. Vascura

### REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") and disability insurance benefits ("DIB"). This matter is before the undersigned for a report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 16), and the administrative record (ECF No. 14). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's non-disability determination.

**I.**    **BACKGROUND**

Plaintiff filed an application for SSI and DIB in May 2018, alleging that he became disabled on March 15, 2016. (R. at 252–58, 259–64.) Plaintiff's application was denied initially in July 2018, and upon reconsideration in August 2018. (R. at 86–101, 102–116, 119–34, 135–50.) A hearing was held on October 3, 2019, before an Administrative Law Judge ("ALJ"), who issued an unfavorable determination on November 14, 2019. (R. at 42–85, 7–27.) The Appeals Council declined to review that unfavorable determination, and thus, it became final. (R. at 1–6.)

Plaintiff seeks judicial review of the Commissioner's final determination. He alleges that the ALJ's residual functional capacity[1] ("RFC") determination is not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ's RFC and the hypothetical question posed to the VE were ambiguous. (ECF No. 15, at PageID # 799–800.) Plaintiff also contends that the ALJ's RFC failed to adequately account for Plaintiff's limitations in concentration, persistence, and pace. (*Id*., at PageID # 800–03.) Last, Plaintiff contends that the ALJ erred by failing to admit and consider an untimely medical record. (*Id*., at PageID # 803–06.) The undersigned finds that these contentions of error lack merit.

## II. THE ALJ's DECISION

The ALJ issued his decision on November 14, 2019, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 7–27.) At step one of the

---

[1] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 4040.1545(a)(1).

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since March 15, 2016, his alleged date of onset. (R. at 13.) At step two, the ALJ found that Plaintiff had the following severe impairments: bipolar disorder; generalized anxiety disorder; personality disorder; attention deficit hyperactivity disorder (ADHD); post-traumatic stress disorder (PTSD); and substance abuse. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) At step four, the ALJ determined Plaintiff's RFC as follows:

> After a careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: carrying out all complexity of tasks with only occasional changes in the work setting where there is reasonable support and structure and relaxed/flexible production rates requirements

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

>in the shift and no end of shift time deadlines; and no more than occasionally interacting with the public, coworkers, and supervisors, and no interaction requiring conflict resolution and persuasion of others to follow demands.

(R. at 16.) The ALJ determined that Plaintiff had no past relevant work experience. (R. at 21.) The ALJ then relied on testimony from a vocational expert ("VE") to determine that in light of Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (R. at 21–22.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 22.)

### III. RELEVANT RECORD EVIDENCE

**A.  Plaintiff's Testimony**

At the October 3, 2019 video hearing, Plaintiff, who was represented by counsel, testified to all of the following. Plaintiff's bipolar disorder prevented him from persisting in all basic work activities. (R. at 64.) He had manic episodes once or twice a year during which he flew off the wall and did risky things. (R. at 65.) Now that he had found the doctor he liked however, everything was "working out" and "things [were] under control." (R. at 66.) He took Geodon for his manic episodes and to keep from getting depressed. (R. at 69.) It was working for him. (R. at 70.)

Plaintiff had anxious distress or physical anxiety. (R. at 66.) When his anxiety was severe, he did not leave the house, sweated profusely, shook, had trouble speaking, and experienced loss of balance, memory issues, and tightness in his chest. (R. at 66–67.) He could experience severe anxiety two to three times a week. (R. at 67.) He received regular counseling for anxiety and took medications including benzodiazepine, Buspar, and Xanax. (R. at 67–68.) Plaintiff also had symptoms from PTSD and that increased his anxiety and gave him flashback dreams. (R. at 72.)

Plaintiff had moderate to severe ADHD. (R. at 69.) He took Vyananse and Clonidine for that. (*Id.*) The last time he was not on those medications for his ADHD, he drove erratically and got into a small car accident. (*Id.*)

**B.      Relevant Treatment Records**

At a pharmacological evaluation on May 11, 2015, Plaintiff reported that he was doing very well and had no complaints. (R. at 365.) Notes dated October 2015 indicate that Plaintiff had run out of his Ritalin, and he wanted to resume his medication. (R. at 352.) Examinations at both visits found the following. The rate, rhythm, and volume of Plaintiff's speech was regular. (R. at 357, 368.) Plaintiff had no associations or overt delusions, but he had clear and linear thought processes, and his judgment and insight were intact. (R.at 357, 368–69.) Plaintiff was oriented to time, place, and person; his recent and remote memory had no apparent impairment; his attention span and concentration were within normal limits; and his language and knowledge fund were appropriate to his age. (R. at 357–58, 368–69.) Plaintiff's mood and affect were also appropriate to situation. (R. at 358, 369.)

In March 2016, Plaintiff tested positive for marijuana, opiates, and amphetamines. (R. at 525, 526, 528.)

Records from Genesis Good Samaritan Hospital dated May 27, 2016, indicate that Plaintiff went to the emergency room after he intentionally overdosed on lisinopril and klonopin. (R. at 411, 413.) Plaintiff initially reported that he took 20 pills of each drug but later reported that he had only taken four or five pills of each. (R. at 413.) Plaintiff ingested alcohol with the pills but he denied drinking daily. (R. at 424, 427.) Plaintiff denied suicidal ideation at the hospital. (R. at 412, 413.) He was also "remorseful about his overdose" and indicated that he had been seeking attention. (R. at 424.) Upon initial examination, Plaintiff was oriented to

5

person, place, and time but he had impaired judgment. (R. at 415.) A second examination done by psychiatry found that Plaintiff was depressed, his affect was constricted, and that his insight and judgment were fair. (R. at 429.) Nevertheless, Plaintiff's attitude was cooperative and spontaneous, and his eye contact was good. (*Id*.) He also had no agitation, slowing, or abnormal movements, and he had steady gait. (*Id*.) Plaintiff's speech was normal in rate and volume, and he denied auditory or visual hallucinations. (*Id*.) Plaintiff's thought processes were goal directed, he had no loosening associations, and his attention, concentration, and recent and remote memory were intact. (*Id*.) He had an average fund of knowledge and intelligence. (*Id*.) Plaintiff was discharged from the hospital the same day. (R. at 430.)

Plaintiff sought psychiatric care from Equitas Health in the Fall of 2017. (R. at 468.) Mental status examinations on August 10, October 10, and November 17, 2017, found that Plaintiff was alert, focused, and cooperative, and he had good eye contact. (R. at 470, 489–90, 483.) Plaintiff's psychomotor functions and the volume and rate of his speech were normal, and the character of his speech was coherent. (R.at 470, 490, 483.) He had a full affect with normal and appropriate amplitude. (*Id*.) Plaintiff's thought processes were logical and linear, his thought content was normal, and he had no hallucinations. (*Id*.) He also had no suicidal or homicidal feelings or plans. (R. at 470, 490, 483–84.) Plaintiff's insight and memory were good, his judgment was intact, his intelligence was average, and his capacity to perform activities of daily living was normal. (R. at 473, 490, 484.)

In March 2018, Plaintiff reported that he was experiencing anxiety and that he had recently quit his job due to anxiety. (R. at 507.) Upon examination, Plaintiff was in no acute distress. (*Id*.) Notes from April 2018 indicate that Plaintiff reported that he had drank alcohol twice the prior week and that he got drunk on weekends. (R. at 532.)

6

Mental status examinations in May and July 2018, found that Plaintiff was focused and cooperative, and he had good eye contact. (R. at 606, 610–11.) Plaintiff's psychomotor functions and the volume and rate of his speech were normal, and the character of his speech was coherent. (R. at 606, 611.) He had a full affect with normal and appropriate amplitude. (*Id*.) Plaintiff's thought processes were logical and linear, his thought content was normal, and he had no hallucinations. (*Id*.) He also had no suicidal or homicidal feelings or plans. (*Id*.) Plaintiff's insight and memory were good; his judgment was intact; his intelligence was average; and his capacity to perform activities of daily living was normal. (*Id*.) On July 9, 2018, Plaintiff reported that his anxiety was 8/10, nevertheless, he also reported that he had "come out of [his] funk a little bit," and that he had noticed an improvement in his symptoms after a month of taking his medications. (R. at 604.)

On November 16, 2018, Plaintiff reported that his anxiety was high and had worsened over the last four to five months. (R. at 622.) He additionally reported that he did not think his Adderall was helping him with focus/concentration and he was experiencing worrying and panic especially in the mornings and at night, but his medications were helping him manage his manic episodes. (R. at 625.) A mental status examination that day found that Plaintiff's mood was depressed, he had difficulty concentrating, and he expressed anxiety even though he did not appear anxious. (R. at 624.) Plaintiff's appearance and behavior were, however, within normal limits; his affect was appropriate; he was oriented to person, place, and situation but not time; he had average intellectual functioning; moderate memory; no apparent deficits in insight/judgment; and clear speech. (R. at 624–25.)

On December 14, 2018, Plaintiff reported that he did not notice much benefit switching from Adderall to Vyanase. (R. at 640.) He did, however, report that it sometimes started to feel

like it was working around "three o' clock." (*Id*.) He also reported that over the past month, his mood had improved and his anxiety had lessened. (*Id*.) In addition, his sleep had been good. (*Id*.) Plaintiff's mood was euthymic, and he had an appropriate affect. (*Id*.) On January 16, 2019, Plaintiff reported that his anxiety had worsened, and he was not sure why. (R. at 643.) His depression was, however, well-managed and he had not had a manic episode in a year. (*Id*.) His mood and affect were anxious at that time. (*Id*.) Plaintiff was prescribed Buspar. (R. at 644.) Plaintiff's healthcare providers discussed starting Inderal for his anxiety. (*Id*.)

On February 21, 2019, Plaintiff reported that he had not taken his medications for the last few days because of a stomach flu. (R. at 646.) He also reported that he did not notice a difference in his anxiety after starting Buspar and that Vyanase had not been helping with his focus/concentration. (*Id*.) Plaintiff's mood was neutral and his affect was appropriate. (*Id*.) Plaintiff's Buspar and Vyanese was increased. (R. at 647.)

On April 8, 2019, Plaintiff reported that his anxiety was better when he took Vyanese but that he did not feel any difference with the increased dose of Buspar. (R. at 657.) His mood was anxious but his affect was appropriate. (*Id*.) Plaintiff's Buspar was again increased. (R. at 658.)

On May 6, 2019, Plaintiff reported that his anxiety had been very high, but that it was worse when he did not take his Vyanase. (R. at 660.) His mood was again anxious, but his affect was appropriate. (*Id*.)

On June 4, 2019, Plaintiff reported that his mom had "a lump," and her upcoming biopsy was causing him increased anxiety and stress. (R. at 663.) He did not notice any benefits from taking Klonopin. (*Id*.) His mood was anxious, but he had appropriate affect. (*Id*.)

On July 2, 2019, Plaintiff reported that his mood and been "up and down" since his mom had been diagnosed with stage-three breast cancer. (R. at 666.) He had been, however, enjoying

himself helping a friend who owned a small business by programming computers. (*Id*.) His mood was anxious, but his affect was appropriate. (*Id*.)

On August 9, 2019, Plaintiff reported that his anxiety had increased after he skipped taking Xanax and had drinks with his friend. (R. at 669.) He indicated that he did not want to drink anymore. (*Id*.) His mood was anxious and depressed. (*Id*.)

On September 6, 2019, he reported that his anxiety was very high after a spot was found on his mom's lungs but before they had been told it was nothing to be worried about. (R. at 672.) He further reported that Xanax was working well and he denied depression, suicidal ideation, and alcohol use for the past month. (*Id*.) Counseling had been helpful. (*Id*.) He believed that he might suffer from PTSD caused by extreme bullying in high school. (*Id*.) His mood was anxious, but he had an appropriate affect. (R. at 673.)

Mental status examinations on December 14, 2018, and January 16, February 21, April 8, June 4, July 2, and September 6, 2019, all found that Plaintiff was well-groomed, his attitude was cooperative and pleasant, he had good eye contact, he was oriented to person, place, and time, he had no agitation, and his gait was steady. (R. at 640, 643, 646, 657, 663, 666, 673.) In addition, Plaintiff had normal rate and rhythm to his speech. (*Id*.) Plaintiff had no danger, self-harm, or suicide risk. (*Id*.) He had appropriate thought processes and focused memory. (R. at 640, 643, 646–47, 657–58, 663, 667, 673.) He also had an average knowledge fund and intelligence, and fair insight and judgment. (R. at 640–41, 643–44, 647, 658, 663, 667, 673.)

C.  **Medical Opinions and Administrative Findings**

The record contains a document signed by Dr. Jeff Haggenjos, a physician that treated Plaintiff. (R. at 577–79.) In it, Dr. Haggenjos wrote that Plaintiff was still dealing with the

9

AIDS virus and that he suffered multiple emotional problems. (R. at 579.) Dr. Haggenjos also wrote that Plaintiff was "unable to work." (*Id*.)

Plaintiff's file was reviewed at the initial level by Dr. Joseph Edwards. (R. at 97–98, 113–14.) In his findings, Dr. Edwards wrote: "Concentration and pace variable. Can carry out a variety of tasks in settings without strict production quotas." (R. at 97, 113.) Dr. Edwards additionally wrote in his findings: "Can interact briefly and occasionally in situations that do not require more than superficial contact, resolving conflicts or persuading others to follow demands." (R. at 98, 114.) Plaintiff's file was reviewed by Dr. Karla Delcour at the reconsideration level. (R. at 130–31, 145–47.) Dr. Delcour's findings were identical to Dr. Edwards' findings. (*Id*.)

### IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V. ANALYSIS

Plaintiff asserts that: 1) the ALJ's RFC determination and questions to the VE were overly ambiguous; 2) the ALJ's RFC determination did not adequately account for Plaintiff's limitations in concentration, persistence, and pace; and 3) the ALJ committed error by failing to admit an untimely medical record. The undersigned addresses each of these assertions in turn and finds that they lack merit.

**A.** **Alleged Ambiguities in the RFC and Hypothetical Question to the VE**

Plaintiff alleges that the ALJ's RFC determination and hypothetical question were ambiguous because it included a limitation that Plaintiff needed a work setting where there would be reasonable support and structure. (ECF No. 15, at PageID # 799–800.) Plaintiff alleges that this was ambiguous because the ALJ failed to indicate how "reasonable" was defined or what limitations the ALJ intended to convey to the VE.

In support of that contention, Plaintiff relies on a report and recommendation that was overruled in *Russell v. Comm'r of Soc. Sec.*, No. 2:15–cv–88, 2016 WL 286431, (S.D. Ohio Jan 25, 2016). In that case, the Magistrate Judge recommended remand where an RFC and hypothetical question to a VE stated that the plaintiff was "hesitant to ask questions or ask for help." *Id*. at *2. The Magistrate Judge found that the language "hesitant to ask questions" was fatally ambiguous even though the VE testified that "as far as hesitant to ask questions . . . if it's not happening all the time and she's not proceeding with incorrect, you know, then I think she could do the cleaning job." *Id*. at *4. The Magistrate Judge concluded that the language "hesitant to ask" described a characteristic rather than a quantifiable limitation— it could mean someone who always hesitated initially, but eventually asked for guidance about work or it could mean someone who never asked for guidance until too late to make corrections. *Id*. at *4. The Magistrate Judge further concluded that any answer to a hypothetical question that was not based on a quantifiable limitation could not serve as substantial evidence to support an ALJ's determination because it failed to accurately portray a claimant's limits. *Id*. at *4. The District Judge, however, determined that the plaintiff had waived objections to the ambiguity of the ALJ's question to the VE by failing to object to its purported ambiguity at the hearing or by cross-examining the VE about the meaning of being "hesitant to ask questions." *Russell v. Colvin*, No. 2:15–cv–88, 2016 WL 11736165, at *2–3 (S.D. Ohio March 2, 2016). Plaintiff's failure to raise the ambiguity issue at the hearing deprived the ALJ of an opportunity to further address and explore it. *Id*. at *3. The District Judge's decision was upheld by the Sixth Circuit Court of Appeals. *Russell v. Comm'r of Soc. Sec.*, No. 16–3442, 670 F. App'x 388 (6th Cir. Nov. 17, 2016).

Such is the case here. The undersigned is not convinced that "reasonable" is ambiguous— reasonable support and structure implies less than extraordinary support and structure are required. But even if the term "reasonable" was susceptible to multiple meanings, Plaintiff has forfeited her ambiguity argument. The hypothetical question that the ALJ posed to the VE included the "reasonable support and structure" limitation. (R. at 80–81.) Plaintiff, who was represented by counsel, had the opportunity further ask the VE about that hypothetical question and to ask for clarification about the VE's understanding of that phrase. Plaintiff did not do so. Instead, Plaintiff, through counsel, asked the VE questions about a hypothetical person who needed redirection, who would be off task up to 33% of the day, and needed to work in isolation. (R. at 83–84.) Accordingly, Plaintiff cannot make this ambiguity argument now. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 636 (6th Cir. 2016) (because the plaintiff failed to probe alleged deficiency in a hypothetical at the ALJ hearing, the argument was forfeited); *Sims v. Comm'r of Soc. Sec.,* 406 F. App'x 977, 982 (6th Cir. 2011) ("Yes, the vocational expert's testimony could have been further refined; but as the district court pointed out, plaintiff's counsel had the opportunity to cross-examine, but asked only one question and did not probe the deficiency now identified on appeal."); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (rejecting claim of error where plaintiff had full opportunity to examine the vocational expert). Accordingly, this allegation of error is not well taken.

**B.     Concentration, Persistence, and Pace Limitations**

Plaintiff alleges that the ALJ failed to adequately account for Plaintiff's concentration, persistence, and pace limitations. (ECFNo. 15, at PageID # 800–03.) Specifically, Plaintiff alleges that the ALJ found that the findings from state agency reviewers were persuasive, but

then he failed to include the limitations that they found in Plaintiff's RFC. Plaintiff has, however, mischaracterized the ALJ's RFC determination.

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in a his or her case file. *Id*. The governing regulations[3] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[4] 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)–(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in

---

[3] Plaintiff's application was filed after March 27, 2017. Therefore, it is governed by revised regulations redefining how evidence is categorized and evaluated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017).

[4] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . . .

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

14

the claim or an understanding of [the SSA's] disability program s policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ must] articulate how [he or she] considered the other most persuasive factors . . . . " §§ 404.1520c(b)(3); 416.920c(b)(3).

In addition, when a medical source provides multiple opinions, the ALJ need not articulate how he or she evaluated each medical opinion individually. §§ 404.1520c(b)(1); 416.920c(b)(1). Instead, the ALJ must "articulate how [he or she] considered the medical opinions . . . from that medical source together in a single analysis using the factors listed [above], as appropriate." *Id.*

In this case, Drs. Edwards and Delcour reviewed Plaintiff's file and found the following limitations: "[c]oncentration and pace variable. Can carry out a variety of tasks in settings without strict production quotas." (R. at 97, 113, 130–31, 145–47.) The ALJ analyzed those findings and found that they were persuasive. (R. at 21.) The ALJ then then incorporated those findings into Plaintiff's RFC. Specifically, the ALJ found that Plaintiff was limited to work settings where there were "relaxed/flexible production rates requirements in the shift and no end of shift time deadlines." (R. at 16.)

Drs. Edwards and Delcour also found the following limitations: "[c]an interact briefly and occasionally in situations that do not require more than superficial contact, resolving

15

conflicts or persuading others to follow demands." (R. at 98, 114, 130–31, 145–47.) The ALJ analyzed those findings and found that they were persuasive. (R. at 21.) The ALJ then incorporated them into Plaintiff's RFC. Specifically, the ALJ found that Plaintiff was limited to work settings where there was "no more than occasionally interacting with the public, coworkers, and supervisors, and no interaction requiring conflict resolution and persuasion of others to follow demands." (R. at 16.) Plaintiff's allegation that the ALJ did not incorporate the findings from Drs. Edwards and Delcour is simply mistaken.

Plaintiff asserts that Drs. Edwards and Delcour also found that he had moderate limitations in several functional subdomains and urges that they should have also been included in Plaintiff's RFC. Defendant contends, and the undersigned agrees, that Plaintiff has conflated steps two and three with the RFC analysis. At step two, an ALJ must assess the severity of a claimant's impairments. "When there is evidence of a mental impairment documented by 'medically acceptable clinical and laboratory diagnostic techniques,' 20 C.F.R. § 404.1508, the regulations require the ALJ to follow a 'special technique' to assess the severity of the impairment, 20 C.F.R. § 404.1520a." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013). The ALJ must rate the degree of a claimant's functional limitation in four broad areas: the ability to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 404.1520a(c)(3). For these areas, the ALJ will rate the plaintiff on a five-point scale: "[n]one, mild, moderate, marked, and extreme." 20 C.F.R. § 404.1520a(c)(4). If the degree of the claimant's limitations is rated as " 'none' or 'mild,' " the ALJ will generally conclude that the plaintiff's impairments are "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [claimant's] ability to do basic work activities . . . ." 20 C.F.R.

§ 404.1520a(d)(1). In this case, Drs. Edwards and Delcour made findings about Plaintiff's functional limitations in the four broad areas and subdomains of those areas. They then made separate findings about Plaintiff's work limitations that stemmed from those severe impairments. The ALJ then incorporated those work limitations that Drs. Edwards and Delcour found into Plaintiff's RFC. The ALJ did not commit reversible error by doing so. Accordingly, this allegation of error lacks merit.

**C.    The Untimely Medical Record**

Plaintiff finally alleges that the ALJ committed error by failing to admit an untimely medical record. Specifically, the ALJ refused to admit a two-sentence letter from a Nurse Practitioner that states as follows:

> Trenton Dawkins is a patient of mine at Mid-Ohio Behavioral Health who is being treated for F31.81 Bipolar II disorder with anxious distress and F90.2 Attention-deficit/hyperactivity disorder, Combined presentation. Due to current mental health symptoms, it may be beneficial for the consumer to be excused from working at this time.

(R. at 36.) (*sic*). This letter, which was dated May 6, 2019, appears to have been submitted to the ALJ the day before the hearing. (R. at 47.)

The regulations require claimants to ". . . ensure that the administrative law judge receives all of the evidence and . . . inform us about or submit any written evidence . . . no later than 5 Business days before the date of the scheduled hearing." 20 C.F.R. §§ 404.935(a), 416.1435(a). Failure to comply may result in an ALJ refusing to consider evidence unless certain circumstances apply, including that a claimant ". . . actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing." 20 C.F.R. §§ 404.935(b)(iv), 416.1435(b)(iv).

17

In this case, the ALJ concluded that the letter was submitted without any explanation as to why how it fit into any exceptions for failing to inform or timely produce evidence. (R. at 10.) Plaintiff correctly contends, however, that his counsel explained to the ALJ at the hearing that she did not know the letter was coming and that it had "came in" to her the night before the hearing. (R. at 47.) Even though Plaintiff's counsel offered that explanation at the hearing, it is unclear if that explanation should have been offered when the letter was submitted the day before the hearing, or if offering it at the hearing was sufficient to trigger the exception made for evidence received less than 5 business days before a hearing despite a claimant's diligence. But the undersigned need not make that determination because any error that the ALJ might have committed by failing to admit the letter was harmless. The letter's conclusory statement that "it may be beneficial for the consumer to be excused from working at this time" constitutes a statement that intrudes "on issues reserved to the Commissioner" and is "inherently neither valuable nor persuasive" under the regulations. 20 C.F.R. § 404.1520b(c)(3)(i) (explaining that "[s]tatements that you are or are not . . . able to work, or able to perform regular or continuing work" are inherently neither valuable nor persuasive). Accordingly, this allegation of error lacks merit.

## VI.   RECOMMENDED DISPOSITION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's non-disability determination.

## VII.   PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the

18

objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a Disrict Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE